1  COAST LAW GROUP, LLP
   MARCO A. GONZALEZ (SBN 190832)
2  LIVIA BORAK (SBN 259434)
3  1140 South Coast Highway 101
   Encinitas, CA 92024
4  Ph: (760) 942-8505
   Fx: (760) 942-8515
5  email: marco@coastlawgroup.com
6
7  Matt O'Malley (SBN 272802)
   San Diego Coastkeeper
8  2825 Dewey Rd # 200
   San Diego, CA 92106
9  Ph: 619-758-7743
10 Email: matt@sdcoastkeeper.org
11
   Attorneys for Plaintiffs
12 SAN DIEGO COASTKEEPER and COASTAL ENVIRONMENTAL RIGHTS
13 FOUNDATION
14
15            **UNITED STATES DISTRICT COURT**
              **SOUTHERN DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17  SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, | Civil Case No.: **'15CV2706 W    DHB** |
| 18 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| 19 | |
| 20 | |
| 21          Plaintiffs, | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |
| 22      v. | |
| 23  REYBRO, INC, a California corporation, | |
| 24 | |
| 25          Defendant. | |

26
27
28

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively referred to herein as "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On May 22, 2015, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Reybro, Inc., ("Reybro" or "Defendant") regarding its violations of the Clean Water Act, and of Plaintiffs' intention to file suit against Defendant. The Notice Letter was sent to the registered agent for Reybro, as required by 40 C.F.R. § 135.2(a)(2), the Facility (Quality Recycling), as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached hereto as Exhibit A and incorporated herein.

3.    More than sixty days has passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33 U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 149 Nettleton Road, Vista, California 92083 ("Quality Facility" or "Site"). Specifically, Defendant discharges storm water runoff from the Site into storm drains, Buena Vista Creek, Buena Vista Lagoon, and ultimately the Pacific Ocean (collectively referred to as the "Receiving Waters"). This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as amended by Order No. 97-03-DWQ*) ("Industrial Permit"). This complaint further seeks relief to prevent discharges in violation of the Industrial Permit as amended by *Order No. 2014-0057-DWQ*. These are ongoing and continuous violations of the Clean Water Act and the Industrial Permit.

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Quality Facility, flow into Vista storm drain systems, Buena Vista Creek, Buena Vista Lagoon and ultimately the Pacific Ocean. This discharge of pollutants in storm water from industrial activities such as the Quality Facility contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

## III.   PARTIES

### A.   San Diego Coastkeeper and Coastal Environmental Rights Foundation

7.      Plaintiff San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California.

8.      San Diego Coastkeeper is committed to protecting and restoring the San

3

Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect the San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges and habitat degradation.

9.      San Diego Coastkeeper's office is located at 2825 Dewey Road, Suite 200, San Diego, California, 92106.

10.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

11.     CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

12.     CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

13.     Plaintiffs have thousands of members who live and/or recreate in and around Buena Vista Creek, Buena Vista Lagoon, and the Pacific Ocean.

14.     Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife, and engage in scientific study including monitoring activities, among other activities. Defendant discharges pollutants from the Sites to the Receiving Waters used by Plaintiffs' members. Thus, Defendant's discharge of pollutants impairs Plaintiffs' members' uses and enjoyment of the Receiving Waters.

15.     The interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Industrial Permit.  The relief sought herein will redress the harms to Plaintiffs caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff's members, for which harm they

have no plain, speedy or adequate remedy at law.

### B.    The Quality Facility Owners and/or Operators

16.    Plaintiffs are informed and believe that Reybro, Inc. is a private corporation organized under the laws of the State of California, and is located in Escondido, California.

17.    Plaintiffs are informed and believe, and thereon allege that Reybro is current owner and operator of the property located at 149 Nettleton Road, Vista, California 92083 ("Property").

18.    Plaintiffs are informed and believe that Reybro has owned and operated the Quality Facility since at least May 22, 2010.

## IV.    STATUTORY BACKGROUND

### A.    The Clean Water Act

19.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

20.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

21.    Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

22.    The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of

pollutants from industrial sites. (33 U.S.C. § 1342).

23.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." (33 U.S.C. § 1365(a)(1)).

24.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

25.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 27, 2009. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

26.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

## B.     California's Industrial Permit

27.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ  and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ, became effective July 1, 2015 ("New Industrial Permit").

28.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

29.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES

permit, to the waters of the United States. Discharge Prohibition A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

30.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

31.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

32.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

33.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

34.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management

Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1).

35.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit. (Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA. And X.B.1.).

36.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

37.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial Permit, Section A(4); New Industrial Permit, Section X.E.).

38.      Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

39.     The objective of the M&RP is to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

40.     The Industrial Permit and New Industrial Permit require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

41.     The Industrial Permit and New Industrial Permit require dischargers to

visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

42. Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

43. The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. (Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). (New Industrial Permit, Section XI.B.2.).

44. Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

45. Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

## V.   STATEMENT OF FACTS

### A.   Quality Facility

46. Plaintiffs are informed, believe, and thereon allege the Quality Facility is a 65,400 square-foot scrap recycling facility. The Quality Facility belongs to Sector N of the Industrial Permit and its standard industrial classification (SIC) code is 5093.

47. Plaintiffs are informed, believe, and thereon allege the Quality Facility recycles scrap metal, plastics, glassware, and cardboard.

48. Plaintiffs are informed, believe, and thereon allege various materials

comprised of household, industrial, and construction site scrap metal are processed and stored onsite.

49.     Plaintiffs are informed, believe, and thereon allege the Quality Facility Owners and/or Operators engage in the following industrial operations: metal scrap recycling, vehicle maintenance and repair work, sorting, processing, crushing and baling of ferrous and non-ferrous metals, storage of scrap metals, renovations, and shipping and receiving of containers.

50.     Plaintiffs are informed, believe, and thereon allege particulates from operations, oil, grease, bacteria, suspended solids, plastics, and metals such as aluminum, copper, lead, iron and zinc materials are exposed to storm water at the Quality Facility.

51.     Plaintiffs are informed, believe, and thereon allege that storm water is conveyed from the northern part of the Site to the south.

52.     The Quality Facility discharges into storm drains that discharge into Buena Vista Creek, downstream to the Buena Vista Lagoon, and ultimately the Pacific Ocean.

53.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

54.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

55.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

56.     Information available to Plaintiffs indicates that each of the surface waters into which the Quality Facility discharges polluted storm water are tributaries to traditional navigable waters, such as the San Diego River and the Pacific Ocean.

57.      Plaintiffs are informed, believe, and thereon allege the Quality Facility's polluted discharges cause and/or contribute to the impairment of water quality in Buena Vista. Elevated levels of bacteria, nutrients, and sedimentation  have resulted in the inability of the Buena Vista to support its beneficial uses.

58.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters.  Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

59.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38 , ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows: lead – .065 milligrams per liter (mg/L); copper – .013 mg/L; zinc – .12 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

60.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP), 2015, §§6.2.1, 8.N, Table 8.N-1). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention

measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id.*, at p. 65).

61.     EPA has established the following benchmark values for Sector N, Scrap Recycling and Waste Recycling Facilities: chemical oxygen demand: 120 mg/L; total suspended solids: 100 mg/L; aluminum 0.75 mg/L; copper[1]: 0.8-.0332; lead[2]: .014-.262; zinc[3] – 0.04-.26 mg/L. (MSGP, §8.N, Table 8.N-1).

62.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for Buena Vista Creek. The Basin Plan establishes the following water quality objectives for the Carlsbad Hydrologic Unit, including Buena Vista Creek: iron: .3 mg/L; pH – not less than 6.5 and not greater than 8.5. (See Basin Plan at Table 3-2; p. 3-25)

### B.     Past and Present Industrial Activity at the Quality Facility

63.     Plaintiffs are informed, believe, and thereon allege that, in its Notice of Intent to Obtain Coverage under Industrial Permit submitted to the Regional Board, the Defendant lists its operations as Standard Industrial Classification ("SIC") code 5093 for facilities primarily engaged in scrap recycling facilities.

64.     Plaintiffs are informed, believe, and thereon allege that the Defendant engages in manufacturing specialty metal products using raw material steels and non-ferrous alloys.

65.     The potential pollutant sources associated with the industrial activities at

---

[1] The copper benchmark is dependent on water hardness.

[2] The lead benchmark is dependent on water hardness.

[3] The zinc benchmark is dependent on water hardness.

the Quality Facility include, but are not limited to: the scrap metal outdoor storage areas; parking areas; shipping and receiving areas; loading and unloading areas; maintenance areas; the operations building; the scrap metal and used appliance storage areas; the piles of turnings and cuttings; and the on-site material handling equipment such as forklifts.

66.     Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the Quality Facility therefore include but are not limited to: toxic metals such as copper, iron, zinc, lead, and aluminum; petroleum products including oil, fuel, grease, transmission fluids, brake fluids, hydraulic oil and diesel fuel; chemical admixtures, acids and solvents; total suspended solids and pH-affecting substances; and fugitive and other dust, dirt and debris.

67.     Based upon Plaintiffs' investigation, Plaintiffs are informed, believe, and thereon allege Defendant stores metal and other materials outside where it is exposed to storm water.

68.      Plaintiffs are informed, believe, and thereon allege that there are drums and other containers stored on-Site that are uncovered and/or uncontained.

69.     Plaintiffs are informed, believe, and thereon allege that at least one drain at the Quality Facility conveys storm water pollution off the site and into area storm drains and the Buena Vista Creek drainage channel.

70.     Plaintiffs are informed, believe, and thereon allege that the Quality Facility lacks effective BMPs to control the flow of storm water from the Facility into the Buena Vista Creek drainage channel. As a result, suspended solids, metal particles, and other pollutants have been and continue to be conveyed from the Quality Facility into the Buena Vista Creek drainage channel.

71.     As a result, Plaintiffs are informed, believe, and thereon allege that during rain events at the Quality Facility, storm water carries pollutants from the outdoor storage areas, bins and dumpsters, floor contaminants, equipment, uncontained metal drums, and other sources directly into the storm drains and Buena Vistas Creek drainage

channel.

72.     Plaintiffs are informed, believe, and thereon allege that the Quality Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the Quality Facility.

### C.   The Quality Facility and its Associated Discharge of Pollutants

73.     Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Quality Facility discharges polluted storm water from the industrial activities at the facility via the City of Vista's storm drain system and into the Receiving Waters.

74.     Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Quality Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

75.     Surface waters that cannot support their Beneficial Uses listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies, Buena Vista Creek is impaired for sediment toxicity and selenium.

76.     Buena Vista Lagoon is impaired for bacteria, nutrients, and sedimentation.

77.     Because discharges from the Quality Facility contain particulates and metals, the Quality Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

78.     Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Quality Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's 2012-2013 annual report monitoring data indicates levels of zinc as high as 11.6 mg/L which is almost 100 times the CTR limit of .12 mg/L and the EPA Benchmark value of .12 mg/L.[4] (MSGP, §8.N,

---

[4] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .13 mg/L.

Table 8.N-1; Fact Sheet, p. 55).

79.     Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Quality Facility has exceeded the CTR Water Quality Standards applicable to copper in California. For example, Defendant's 2012-2013 annual report monitoring data indicates levels of copper as high as 9.91 mg/L which is 762 times the CTR limit of .013 mg/L and over 700 times the EPA Benchmark value for copper of .014 mg/L.[5] (MSGP, Fact Sheet, p. 55).

80.     Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Quality Facility has exceeded the CTR Water Quality Standards applicable to lead in California. For example, Defendant's 2012-2013 annual report monitoring data indicates levels of lead as high as 2.23 mg/L which is 34 times the CTR limit of .065 mg/L and over 27 times the EPA Benchmark value for lead of .082 mg/L.[6] (MSGP, Fact Sheet, p. 56; Table 8.N-1).

81.     Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Quality Facility has also exceeded the EPA Benchmark value for aluminum. For example, Defendant's 2012-2013 annual report monitoring data indicates exceedance levels of aluminum at 23.9 mg/L, which almost 32 times the EPA Benchmark value for aluminum of .75 mg/L. (MSGP, §8.N, Table 8.N-1).

82.     More recently, Defendant's 2014-2015 monitoring data indicated aluminum exceedance levels of 4.47 mg/L – which is almost six times the benchmark.

83.     Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Quality Facility has exceeded the EPA Benchmark value for iron. For example, Defendant's annual report monitoring data indicates exceedance levels of iron ranging from 3.92 to 78.2 mg/L for the last four years, and as high as 6.55 mg/L for the most recent 2014-2015 reporting period. The EPA benchmark value for iron is 1.0

---

[5] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .014 mg/L.
[6] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .082 mg/L.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

mg/L. (MSGP, Fact Sheet, p. 55).

84.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Quality Facility has also exceeded the San Diego Basin Plan Water Quality Objective for hydrogen ion concentration (pH). For inland surface waters, the pH Water Quality Objective is a range, from 6.5 to 8.5. Storm water discharged from the Quality Facility has failed to meet the minimum threshold of 6.5. For example, during the 2011-2012 reporting year, Defendant's monitoring data indicated a pH as low as 3.14. During the 2014-2015 reporting years, pH was recorded at 6.28.

85.     Plaintiffs are informed, believe, and thereon allege that during every significant rain event that has occurred at the Quality Facility since May 22, 2010 through the present, Defendant has discharged and continues to discharge storm water from the Quality Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

86.     Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Quality Facility. The inadequacy of the BMPs at the Quality Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for this Site. Therefore, storm water discharges from the Quality Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

87.     Plaintiffs are informed, believe, and thereon allege that since at least May 22, 2010 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the Quality Facility in violation of Effluent Limitation B(3) of the Industrial Permit. Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

88.     Based on their investigation of the Quality Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 22, 2010 through the present. Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

89.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the Quality Facility since at least May 22, 2010, in violation of Receiving Water Limitations C(3) and C(4) of the Industrial Permit and New Industrial Permit Receiving Water Limitation VI.A. Each day that Defendant has operated the Quality Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

## D.     Defendant's Monitoring Program

90.     The Quality Facility is required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5). These procedures require that a sample be taken from all discharge locations at the Quality Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

91.     Plaintiffs are informed, believe, and thereon allege that despite the extremely high levels of pollutants reported in the samples that were taken at the Quality Facility, the Defendant has not sampled as required.

92.     Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully sampled and reported during the 2010-2011, 2012-2013, 2013-2014, and 2014-2015 reporting years by failing to sample the required two storm events, despite there being numerous rain events sufficient to generate runoff occurring during the business hours at the Quality Facility.

93.     Information available to Plaintiffs indicates that Defendant has not

submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the Quality Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

## VI.      CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

94.      Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

95.      Plaintiffs are informed, believe, and thereon allege that as a result of the operations at the Quality Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the Quality Facility to the Receiving Waters.

96.      Plaintiffs are informed, believe, and thereon allege that Defendant's discharges of contaminated storm water have caused and continue to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Discharge Prohibition A(2) of the Industrial Permit and Section VI.C of the New Industrial Permit.

97.      Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have, and continue to, adversely affect human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Permit and Section VI.B. of the New Industrial Permit.

98.      Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to an exceedance of Water Quality Standards in violation of Receiving Water Limitation C(2) of the Industrial Permit and VI.A. of the New Industrial Permit.

99.     Plaintiffs are informed, believe, and thereon allege that from at least May 22, 2010 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from the Quality Facility to Receiving Waters in violation of the prohibitions of the Industrial Permit.  Thus, Defendant is liable for civil penalties for at least 42 violations of the Industrial Permit and the CWA.

100.     Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Industrial Permit and the CWA are ongoing.

101.     Defendant will continue to be in violation of the Industrial Permit requirements each day the Quality Facility discharges contaminated storm water in violation of Industrial Permit prohibitions.

102.      Every day that Defendant has discharged and/or continues to discharge polluted storm water from the Quality Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

103.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

104.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology In Violation of the Industrial Permit and the Clean Water Act (Violations of 33 U.S.C. §§1311, 1342)**

105.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

106.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

107.     Sampling of the Quality Facility's storm water discharges as well as Plaintiffs' observations and local agency inspections of the Quality Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations of the Industrial Permit and New Industrial Permit.

108.     Plaintiffs are informed, believe, and thereon allege that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA every day since at least May 22, 2010, and of the BAT/BCT requirements of the New Industrial Permit since July 1, 2015.

109.     Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Effluent Limitations and the CWA are ongoing.

110.     Defendant will continue to be in violation every day the Quality Facility operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the Quality Facility.

111.     Every day that Defendant operates the Quality Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

112.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

113.     An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§ 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Develop and/or Implement an Adequate
Storm Water Pollution Prevention Plan
in Violation of the Industrial Permit and Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

114.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

115.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement an adequate SWPPP for the Quality Facility that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X of the New Industrial Permit.

116.    Defendant has been in violation of the SWPPP requirements every day since at least May 22, 2010.

117.    Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

118.    Defendant will continue to be in violation of the SWPPP requirements every day the Quality Facility operates with an inadequately developed and/or implemented SWPPP for the Quality Facility.

119.    Each day that Defendant operates the Quality Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

120.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for

Inflation, 40 C.F.R. §12.4.

121.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Failure to Implement an**
**Adequate Monitoring and Reporting Program**
**In Violation of the Industrial Permit and the Clean Water Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

122.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

123.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement an adequate M&RP for the Quality Facility as required by Section B and Provision E(3) of the Industrial Permit and Section XI of the New Industrial Permit.

124.     Plaintiffs are informed, believe, and thereon allege that conditions at the Quality Facility, as determined via sampling of storm water discharges from the Quality Facility, and the annual reports submitted by Defendant all demonstrate that the Quality Facility has not implemented an adequate M&RP that meets the requirements of the Industrial Permit and New Industrial Permit.

125.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to collect samples from all discharge points during all storm events in violation of Section B(5) of the Industrial Permit.

126.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to identify inadequacies in its SWPPP and BMPs.

127.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

128.     Defendant will continue to be in violation of the Industrial Permit, New

Industrial Permit and the CWA each day the Quality Facility operates with an inadequately implemented M&RP.

129.    Each day Defendant operates the Quality Facility without implementing an adequate M&RP for the Quality Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

130.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

131.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Conduct Required Rain Event Sampling in
### Violation of the Industrial Permit

132.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

133.    Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of Industrial Permit Section B(7) and B(5) by failing to collect at least two samples of storm water runoff, including one set of samples during the first storm event of the wet season.

134.    Plaintiffs are informed, believe, and thereon allege that Defendant failed to collect two samples during the 2010-2011, 2012-2013, 2013-2014, and 2014-2015 wet seasons.

135.    Information available to Plaintiffs indicates that there were numerous qualifying rain events during the 2010, 2011, 2012, 2013, 2014, and 2015 wet seasons.

136.    Defendant has been in violation of the Industrial Permit and the CWA for

each day the Quality Facility operates without sampling as required by the Industrial Permit.

137.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the presents, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

138.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a).  Continuing commission of the omissions alleged above would irreparably harm the Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION
### Failure to Submit Reports in
### Violation of the Industrial Permit

139.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

140.    Plaintiffs are informed, believe, and thereon allege that Defendant's annual reports did not meet the monitoring and reporting requirements of the Industrial Permit in violation of Section B(13) and B(14) of the Industrial Permit.

141.    Plaintiffs are informed, believe, and thereon allege that the Defendant's annual reports were inaccurate and stated that the SWPPP's BMPs address existing potential pollutant sources when they did not, in violation of the Industrial Permit Section B.

142.    Plaintiffs are informed, believe, and thereon allege that Defendant's annual reports were false and stated that the SWPPP was up to date when it was not, in violation of Section B of the Industrial Permit.

143.    Plaintiffs are informed, believe, and thereon allege that Defendant failed to submit a written report identifying what additional BMPs will be implemented to achieve Water Quality Standards even though Defendant discharge exceeded receiving

Water Quality Standards, in violation of Receiving Water Limitations C(3) and C(4) of the Industrial Permit.

144. Defendant has been in violation each day the Quality Facility operates without reporting as required by the Industrial Permit.

145. Defendant's violations of the Industrial Permit and the CWA are ongoing.

146. Every day Defendant operates the Quality Facility without reporting as required by the Industrial Permit is a separate and distinct violation of the Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

147. Defendant has been in daily and continuous violation of the Industrial Permit's reporting requirements every day since at least May 22, 2010.

148. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

149. An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

150. Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a. A Court order declaring Defendant to have violated and to be in violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a) for its unlawful discharges of pollutants from the Quality Facility in violation of the substantive and procedural requirements of the Industrial Permit, and as of July 1, 2015, the New Industrial Permit;

b. A Court order enjoining the Defendant from violating the substantive

and procedural requirements of the New Industrial Permit;

       c.    A Court order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at the Quality Facility occurring since May 22, 2010, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

       d.    A Court order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

       e.    A Court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

       f.    Any other relief as this Court may deem appropriate.

Dated: December 2, 2015             Respectfully submitted,

                                 COAST LAW GROUP LLP

                                 By: s/Marco A. Gonzalez
MARCO A. GONZALEZ
Attorneys for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION and
SAN DIEGO COASTKEEPER
E-mail: marco@coastlawgroup.com

                                 SAN DIEGO COASTKEEPER

                                 By: s/Matt J. O'Malley
MATT J. O'MALLEY
Attorneys for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION and
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org